Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223



FILED
DISTRICT COURT OF GUAM
FEB 0 5 2008
JEANNE G. QUINATA
Clerk of Court

Attorneys for Defendant
First American Title Insurance Company

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| CYFRED, LTD., for itself and on behalf of other similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY, PATCO, MANU MELWANI and DOES 1-298, inclusive,<br><br>Defendants. | CIVIL CASE NO. 07-00024<br><br>**REQUEST FOR JUDICIAL NOTICE** |

Pursuant to Rule 201 of the Federal Rules of Evidence, defendant First American Title Insurance Company requests that this Court take judicial notice of the order by the Guam Acting Commissioner of Banking and Insurance withdrawing approval of the StayWell Plan Group Health Insurance Agreement with Prefunded Deductible dated January 16, 2008, a copy of which is attached hereto as "Exhibit A". This Court may take judicial notice of the orders and decisions of administrative agencies. *See, e.g.,* Missouri Pacific Railroad Co. v. United Transportation Union, General Committee of Adjustment, 580 F. Supp. 1490, 1493 (E.D. Mo. 1986), *aff'd*, 782 F. 2d 107 (8th Cir. 1986), *cert. denied*, 482 U.S. 927 (1987).

DOOLEY ROBERTS & FOWLER LLP

Date: February 5, 2008      By: Seth Forman
                            for **DAVID W. DOOLEY**
                            Attorneys for Defendant First American Title Insurance Company

ORIGINAL

Dipåttamenton Kontribusion yan Adu'ånå

**DEPARTMENT OF**
# REVENUE AND TAXATION
**GOVERNMENT OF GUAM** Gubetnamenton Guåhan

FELIX P. CAMACHO, Governor Maga
KALEO S. MOYLAN, Lt. Governor Tiñente Gubetn

ARTEMIO B. ILAGAN, Dir
Dir
JOHN P. CAMACHO, Deputy Dir
Segundo Dir

January 16, 2008

Stuart Lonergan
Chief Executive Officer
Zurich Insurance (Guam) Inc
GCIC Building, Ste 900
414 W. Soledad Avenue
Hagatna, Guam 96910

Maria D.R. Taitano
President and Acting CEO
Staywell Insurance, Inc.
P O Box CZ, Hagatna, Guam 96932

Re: Withdrawal of Approval of the Staywell Plan Group Health Insurance Agreement with Prefunded Deductible

Dear Mr. Lonergan and Ms. Taitano:

Todd Baum (Baum) was insured under the 2003 Staywell Silver Commercial Plan (Silver Plan) a comprehensive group health insurance plan. Baum complains that the Silver Plan of which he is member is in violation of the HIPAA nondiscrimination policy 29 C.F.R. 2590.702 and bonafide wellness programs to prevent or control a disease. (Page 2, Baum's letter to Commissioner Andreas Jordanou dated October 8, 2004). The use of the prefunded deductible in the Silver Plan discriminates against similarly situated individuals in the same group. Some get a refund and some do not based on their health. (Page 3, Baum's letter to Commissioner Andreas Jordanou dated December 1, 2004). Commissioner Andreas Jordanou transmitted the complaint of Baum to the Attorney General on December 9, 2004. Thereafter, sometime in May 2005, Guam Assistant Attorney General Stephen A. Cohen also brought this matter to the attention of Mikel W. Schwab, Office of the US Attorney.

Nichido Insurance Company (Pacific) Ltd now known as Tokio Marine Pacific Insurance, Ltd (Tokio Marine Pacific) also filed a complaint that the Staywell Plan with a refund feature is not in compliance with the HIPAA nondiscrimination provision a policy and bonafide wellness program. This complaint of Tokio Marine Pacific was sent to the attention of Mikel W. Schwab, Office of the US Attorney in June 2005.

The Staywell Silver Plan defines the following terms:

Deferred Premium means the amount specified as Deferred Premium in Exhibit B hereto attached, received in trust by Staywell under the terms of the Plan which shall be deposited and held as property of the Subscriber until such time as it is returned as Refund to the Subscriber. Deferred Premium shall accumulate and be credited to each Class I, Class II and Class III, Subscriber for each month that the Subscriber is enrolled in the Plan, not to exceed the Maximum Refund Amount specified in paragraph 9 of Section XV of the Staywell Plan Group Certificate. ( 2003 Staywell Group Health Insurance Agreement Par. 2(f)

Prefunded Deductible means the amount specified as Prefunded Deductible in Exhibit B hereto attached, received in trust by Staywell under the terms of the Plan. The Prefunded Deductible shall accumulate and be credited to each Class I, Class II and Class III, Subscriber for each month that the Subscriber is enrolled in the Plan, not to exceed the Maximum Refund Amount specified in paragraph 10 of Section XV of the Group Certificate and is refundable to the Subscriber subject to the terms and conditions of this Agreement. ( 2004 Staywell Group Health Insurance Agreement Par. 2(r)

Payment means the sum of Premium and deferred Premium paid by the Employee to Staywell under the terms of the Plan for each Subscriber. Said Payment is comprised of the respective contributions made to the Plan by the employer and the Subscriber and collectively remitted by the Employer to Staywell under the terms of the Plan. (Staywell Group Health Insurance Agreement Par. 2(o)

Premium means the amounts, specified as Premium in Exhibit B attached hereto, received by Staywell under the terms of the Plan for the insurance coverage provided Staywell to each Enrollee. The Premium shall be the property of Staywell immediately upon receipt by Staywell. (Staywell Group Health Insurance Agreement Par. 2(q)

Refund means that amount returned or returnable to the Subscriber pursuant to paragraphs 9, 10, and 11 of Section XV of the Staywell Plan Group Certificate, Exhibit A hereto. (Staywell Group Health Insurance Agreement Par. 2(s)

Use of Deferred Premium and Calculation of Refund. The maximum potential Refund Allowable to a Subscriber under the Plan ("maximum Refund Amount") shall be the amount of deferred Premium that can be accumulated and held for a Subscriber if the Subscriber is enrolled in the Plan for the entire Contract Period, calculated no later than six months following the close of the Contract Period.

Subject to paragraph 11 of Section XV of the Staywell Plan Group Certificate, the Maximum Refund Amount for each class of Subscriber is:

| | Medical only | Medical and Dental |
|---|---|---|
| Class I | $ 375.00 | $ 575.00 |
| Class II | $ 750.00 | $1,050.00 |
| Class III | $1,236.00 | $1,586.40 |

Only medical and dental Claims actually incurred during the Contract Period and paid within the Contract Period or paid no later than six (6) months following the close of the Contract Period shall be included in the calculation of the Refund.

Notwithstanding any other provision of this Agreement, a Subscriber who has been enrolled in the Staywell Plan for less than 180 days during the Contract Period shall receive no Refund. (Section XV General Provisions Par.9)

Refund Administration.
  a. Refunds shall be calculated in the manner provided in paragraph 9 of Section XV of the Staywell Plan Group Certificate.

The Payment of payment of Refunds to eligible Subscribers shall be made by Staywell no later than the 31st day of July following the close of the Contract Period. For medical and dental Claims incurred during the Contract Period but received after the Refund is paid, the Company shall be liable only for that portion of the medical or dental Claim which exceeds the amount of the Refund paid to the Subscriber. Except as stated in paragraph 8 of Section XVI, "Payment of Late Claims", the Company is under no obligation to pay any medical Claim which is received more than twelve months after the last day on which services were rendered. (Section XV General Provisions Par.10)

Early Refund. The Company may at its option, offer an early refund to its Subscribers. The Subscriber is not under any obligation to accept the early refund. If the Subscriber does not accept the early refund, the Refund as referred to I n paragraph 2.s of the Agreement shall apply.

  a. The early refund is calculated on the same principle as the Refund but is based on the Subscriber's membership in the plan between January 1st through November 30th. To be eligible for an early refund, the Subscriber must have been enrolled at least 180 days within the Contract Period.

  b. All medical and dental claims incurred prior to December 1st would be deducted from the early refund. For medical and dental Claims incurred prior to December 1st but received after the early refund is paid, the Company shall be liable only for that potion of the medical of dental Claim which exceeds the amount refunded to the Subscriber.

If the Subscriber accepts the early refund the amount of the Deferred Premium for the twelfth month of coverage shall become Premium and shall not be subject to the Refund. Nevertheless, coverage shall continue through the twelfth month of the Contract Period regardless of whether the Subscriber takes an early Refund. The payment of such Refunds, if accepted by the Subscriber, shall be made by Staywell no later than the 31st day of December of the Contract Period. (Section XV General Provisions Par.11)

It must be pointed out that Staywell began using the prefunded deductible in 2004. In 2003 Staywell was using the term Deferred Premium. Please see definitions above.

Pursuant to the provisions of 22 GCA §18308, the Commissioner has the authority to approve or disapprove each insurance policy form prior to the use of such insurance policy forms in Guam. In accordance with this authority the Commissioner has reviewed group health insurance policy forms for

compliance with Guam laws and the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and its regulations. The Commissioner approved the Staywell Silver Plan prior to the enactment of the HIPAA.

The final regulations of the HIPAA are effective February 12, 2007 and apply to plan years beginning on or after July 1, 2007.

In light of the final regulations of HIPAA, as well as the complaint Todd Baum of GFT and that of Tokio Marine Pacific, the Commissioner now revisits the approval of Staywell Silver Plan to determine if the refund feature is in compliance with the final HIPAA regulations.

We begin by looking at the Staywell Silver Plan design. The Pillsbury Winthrop LLP described the plan design of the Staywell Plan:

" The plan design includes a pre-funded deductible whereby the subscriber pays money in monthly or bi-weekly increments over the course of the year and it is deposited in a trust fund for the subscriber. Staywell pays claim first out first out of this subscriber deductible fund before the carrier is obligated to make payments for claims under the Plan. In the event that the subscriber has not accumulated sufficient t funds in the deductible fund to pay for a covered service under the Plan, the carrier advances the funds to pay the claim. At the end of the of the Plan year, Staywell reconciles the amounts paid into the Subscriber's deductible fund with the claims paid. If there is a surplus in the deductible fund, it is refunded to the subscriber. If there is no surplus, the Subscriber has met his or her responsibility to pay medical costs out of the deductible fund and the carrier pays for the covered services less the copayment." (Page 1, Opinion Letter of Maureen Corcoran dated January 6, 2004 addressed to Donald B. Davis of Staywell Insurance, lawyer at the Pillsbury Winthrop LLP). The Staywell Plan design was also set forth on the letter of William S. Bossany; Staywell Associate Administrator to Baum dated October 13, 2004.

The Pillsbury opinion stated the question presented and its conclusion thereto:

"Staywell expressed concern that someone might interpret the Plan and the refund of the Prefunded Deductible to somehow violate the HIPAA prohibition on a "rebate" of premium based on a health factor. We conclude that there is no rebate of premium under the Plan because the refund of the Prefunded Deductible does not result in a premium or premium contribution differential among similarly situated enrollees in the Plan based on a health factor." (Page 5, Pillsbury Opinion Letter dated January 6, 2004.)

In a letter dated September 8, 2006, Roberta Casper Watson, of Trenam Kemker Attorneys, (Trenam) lawyer for Tokio Marine Pacific addressed certain issues to Mikel W, Schwab of the US Attorneys Office. Trenam opines that the "entire year's PFD (prefunded deductible) amount is universally available at any point during the plan year, for the payment of incurred claims. This universal availability of the maximum PFD payment for claims shifts to Staywell some risk, in that the employee might drop out of the Plan later in the year and Staywell might not actually receive the remaining payment it was expecting from the PFD. The universal availability practice constitutes "risk-shifting" of a type common to insurance products but not common to funds held in trust."

Trenam opines that " As noted above, the Staywell Plan contract language separates the employer and employee payments into separate dollar amounts – part for the regular premium (which is applied toward

the regular insurance coverage), and the other portion for the PFD. The Pillsbury letter defends the PFD refunds to those employees with lower claims experience by taking the position that the PFD payment is somehow separate from the regular premium (stating that the regular premium is not "related to the deductible"). Whether the PFD is or is not "related to" the premium for the primary insurance coverage, we believe that the PFD feature, because of the risk-shifting inherent in the design, is health insurance. Whether the plan as a whole constitute one or two programs of health insurance is immaterial, and the HIPAA prohibitions are fully applicable whether the health insurance is consolidated into one program or divided into two. Therefore when a portion of the PFD premium is refunded to the participants with lower claims experience, and such refund is reduced or withheld from those with higher claims experience, the prohibition against discrimination in premiums or contribution due to health status is violated. (Page 5, Trenam Letter of September 8, 2006.).

This review of previously approved policy forms was made specifically with regards to the final rules prohibiting discrimination against participants and beneficiaries based on health related factor and wellness programs. (HIPAA Regulations 26 C.F.R. § 54.9802-1; 29 C.F.R. §.2590.702; 45 C.F.R. § 146.121)

HIPAA prohibits discrimination against participants and beneficiaries based on health factor. In general a group health plan may not require an individual, as a condition of enrollment or continued enrollment under the plan, to pay a premium or contribution that is greater than the premium or contribution for a similarly situated individual (described in paragraph (d) of this section) enrolled in the plan based on any health factor that relates to the individual or a dependent of the individual. ). (Department of the Treasury Reg. 26 C.F.R. § 54.9802-1(c); Labor 29 C.F.R .§ 2590.702 (c)(1); HHS 45 C.F.R. § 146.121(b)(1).

<u>Discounts, rebates, payments in kind, and any other premium differential mechanisms are taken into account in determining an individual's premium or contribution rate,</u> (for rules relating to cost-sharing mechanisms , see paragraph (b)(2) of this section (addressing benefits (26 C.F.R. § 54.9802-1(c)(1)(ii); Labor 29 C.F.R .§ 2590.702 (c)(1)(ii). (Emphasis ours).

A wellness program is any program designed to promote health or prevent disease (26 C.F.R § 54.9802-1 (f); 29 C.F.R § 2590.702 (f) ; and 45 C.F.R. §146.121 (f). A wellness program is not subject to requirements if the program does not require an individual to satisfy a standard that is related to a health factor or if the wellness program does not provide a reward.

However, if the wellness program is based on an individual satisfying a standard that is related to a health factor as a condition for obtaining a reward, certain requirements must be met.

(i) The reward for the wellness program coupled with the reward for other wellness programs that requires satisfaction of a standard related to a health factor must not exceed 20 percent of the cost of employee-only coverage under the plan or 20 percent of the costs of the coverage in which an employee and any dependents are enrolled. A reward can be in the form of a discount or rebate of a premium or contribution, a waiver of all or part of cost-sharing mechanism (such as deductibles, copayments, or coinsurance), the absence of a surcharge, or the value of a benefit that would otherwise not be provided under the plan.

(ii) The program must be reasonably designed to promote health of prevent disease. The program must not be overly burdensome, is not a subterfuge for discriminating based on a health factor, and is not highly suspect in the method chosen to promote health or prevent disease.

(iii) The program must give individuals eligible for the program the opportunity to qualify for the reward under the program at least once a year.

(iv) The reward under the program must be available to similarly situated individuals.

    (A) A reward is not available to similarly situated for a period unless the program allows :
        (1) a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is unreasonably difficult due to medical condition to satisfy the otherwise applicable standard; and
        (2) a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is medically inadvisable to attempt to satisfy the otherwise applicable standard.

    (B) A plan or issuer may seek verification, such as a statement from an individual's physician, that a health related factor makes its unreasonably difficult or medically inadvisable for the individual to satisfy or attempt to satisfy the otherwise applicable standard.

(v) (A) The plan must disclose in all plan materials describing the terms of the program the availability of a reasonable alternative standard (or the possibility of waiver of the otherwise applicable standard) required under paragraph (f)(2) (iv) of this section. However, if the plan materials merely mention that a program is available, without describing its terms, this disclosure is not required.

(B) The following language, or substantially similar language, can be used to satisfy the requirement of this paragraph (f)(2)(v): " If it is unreasonably difficult due to a medical condition for you to achieve the standards for reward under this program, or if it is medically inadvisable for you to attempt to achieve the standards for the reward under this program, call us at [insert telephone number] and we will work with you to develop another way to qualify for the reward." In addition, other examples of language that would satisfy this requirement are set forth in Examples 3,4, and 5 of paragraph (f)(3) of this section.

**The Staywell Plan with a refund feature is discriminatory based on health factor.**

There is no question that an individual that has a medical or a health condition will see more medical providers, will incur more claims and will get smaller or no refund. There is also no question that individuals who are healthy will incur lesser or no claims, will get refund larger than those individuals with medical or health condition.

The Pillsbury opinion letter for Staywell maintains that under the Plan it charges two types of premium, namely, premium and prefunded deductible (deferred premium in 2003). The prefunded deductible is

placed in a trust fund to pay for the subscriber's liability for the part of the deductible portion of his or her medical costs. The balance of the prefunded deductible or deferred premium is paid to the Subscriber either at an early refund or before the end of six (6) months of the Staywell Plan year. However, Staywell omitted to state that if the prefunded deductible is held in trust for the subscriber, the interest on the prefunded deductible must accrue to the individual subscriber.

The question whether or not the prefunded deductible is a regular insurance premium has been rendered moot by the final HIPAA Regulations, which became effective on February 12, 2007. The final HIPAA rules states that discounts, rebates, payments in kind, and any other premium differential mechanisms are taken into account in determining an individual's premium or contribution rate. Under the final HIPAA rules, the prefunded deductible must be taken into account in the determination of each individual's premium or contribution rate. Based on the combined amount of the premium and the prefunded deductible any subscriber that does not get a refund, compared to those who get a refund is paying a premium or a contribution that is greater than those similarly situated subscribers under the Staywell Silver Plan. By this determination, the Staywell Plan with the prefunded deductible is not in compliance with HIPAA rules that prohibit discrimination against participants and beneficiaries based on a health factor.

### The refund feature of the Staywell Plan is does not meet the requirements of wellness programs.

The Staywell Silver Plan imposes the condition that the Subscriber must incur claims that are lesser than the maximum amount of the prefunded deductible. Claims are incurred due to the treatment of a medical condition or a disease. Because this is a standard that is related to a health factor – lower claims incurred than the amount of the prefunded deductible – the Staywell Silver Plan must meet the requirements of the wellness program.

**Firstly, the reward for the wellness program must not exceed the maximum 20 percent of the cost of employee only coverage or 20 percent of the cost of the coverage in which an employee and any dependents are enrolled in the Staywell Silver Plan.**

The final HIPAA rules clearly state that discounts, rebates, payments in kind, and any other premium differential mechanisms are taken into account in determining an individual's premium or contribution rate. In applying this rule, the premium and the prefunded deductible (deferred premium in 2003), a premium differential mechanism, must be added or combined to compute an individual's premium or contribution rate. The combination of the premium and the prefunded deductible as shown in Exhibit B of the Agreement is premium. Interestingly, in Exhibit B this is labeled as "payment". Payment is actually the monthly premium contribution of an individuals categorized as Class I, II and III.

To compute the annual premium, the employee only coverage monthly premiums set forth in Exhibit B to the Agreement was multiplied by 12 months. (Please see Table I, Computation). Further, the Deferred Premium (Prefunded Deductible in 2004) that is the Maximum Refund Amount was divided by the Annual Payment to derive the percentage of the refund in relation to the Annual Payment. The results show the Staywell Silver Plan refunds to each Class of Subscribers ranged from 23.67% to 29.42%. (Please see Table I, Computation). The refunds clearly exceeds the maximum 20 percent of the cost of

employee only coverage or 20 percent of the cost of the coverage in which an employee and any dependents are enrolled in the Staywell Silver Plan.

**Secondly, the program must be reasonably designed to promote health of prevent disease. The program must not be overly burdensome, is not a subterfuge for discriminating based on a health factor, and is not highly suspect in the method chosen to promote health or prevent disease.**

The Staywell refund does not appear to be designed to promote health or to prevent disease. To get the refund the Subscriber and his dependents, if any, are encourage not to seek medical care or to incur medical claims. For those that have medical conditions it is overly difficult not to seek medical care and overly difficult not incur claims to get the amount of refund that healthy individuals are able to get. This refund feature is a subterfuge for discrimination based on a health factor and does not promote health or prevent disease.

**Thirdly, the program must give individuals eligible for the program the opportunity to qualify for the reward under the program at least once a year.**

The design of the Staywell Silver Plan, particularly its refund feature does not give an individual with a health condition the opportunity to qualify for the refund at least once a year. An individual with a health condition will certainly incur claims before getting or not getting well within the plan year of twelve months. Once the claims are incurred, the opportunity to qualify for the refund once a year becomes lesser. This is also particularly true for Subscribers who have not met 180 days membership in the Silver Plan.

**Fourthly, the reward under the program must be available to similarly situated individuals.**

A reward is not available to similarly situated for a period unless the program allows :
1. a reasonable alternative standard ( or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is unreasonably difficult due to medical condition to satisfy the otherwise applicable standard; and
2. a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is medically inadvisable to attempt to satisfy the otherwise applicable standard.

A plan or issuer may seek verification, such as a statement from an individual's physician, that a health related factor makes its unreasonably difficult or medically inadvisable for the individual to satisfy or attempt to satisfy the otherwise applicable standard.

The Staywell Silver Plan does not provide for a reasonable alternative standard for Subscribers and individuals that have medical condition or medically inadvisable for individuals to satisfy or attempt to satisfy the applicable standard - "filing claims less than the prefunded deductible" -for obtaining the reward or refund. There is also no language in the Agreement for the waiver of incurring lesser claims in a plan year in order to get the refund

**Lastly, the plan must disclose in all plan materials describing the terms of the program the availability of a reasonable alternative standard (or the possibility of waiver of the otherwise**

applicable standard) required under paragraph (f)(2) (iv) of this section. However, if the plan materials merely mention that a program is available, without describing its terms, this disclosure is not required.

The Staywell Silver Plan with a refund feature does not disclose in all plan materials the availability of a reasonable standard or the possibility of waiver of the applicable standard as required under the wellness program disclosures.

In view of the above findings, and in accordance with the authority of the Commissioner to approve or disapprove policy forms in accordance with Guam laws and the final HIPAA regulations, this office hereby issues the following orders:

1. The approval issued to the Staywell Silver Plan policy form or any other Staywell Plans that is similar in plan design to the Silver Plan is hereby withdrawn effective upon receipt of this letter.

2. Because the final HIPAA Regulations apply to plan years beginning on or after July 1, 2007, Staywell Insurance, Inc and or Zurich Insurance (Guam), Inc are hereby individually and collectively given the time to phase out the Staywell Silver Plan or other Staywell plans with refund feature that is similar in design to the Staywell Silver Plan until the expiration of such health insurance agreements.

3. Staywell Insurance, Inc and or Zurich Insurance (Guam), Inc are ordered to stop issuing the Staywell Silver Plan or other Staywell plans with refund feature that is similar in design to the Staywell Silver Plan effective upon receipt of this letter.

Pursuant to the provisions of 11 GCA §103106, Staywell Insurance, Inc and or Zurich Insurance (Guam), Inc are hereby given ten (10) days from receipt hereof to appeal the above-enumerated orders.

Sincerely,

ARTEMIO B. ILAGAN
Acting Banking and Insurance Commissioner