1 | **THE VANDEVELD LAW OFFICES, P.C.**
Historical House, Second Floor
2 | 123 Hernan Cortes Avenue
Hagåtña, Guam 96910
3 | Office:     (671) 472-4396/488-0888
Facsimile: (671) 472-2561
4 |

**FILED**
**DISTRICT COURT OF GUAM**

APR 29 2008 nba

5 | *Attorney for Plaintiff:*
     Cyfred, Ltd., Class,
     Deceptive Acts Subclass
6 |     Denied Claims Subclass.

**JEANNE G. QUINATA**
**Clerk of Court**

## IN THE DISTRICT COURT OF GUAM

CYFRED, LTD for itself and other similarly )    Civil Case No.07-00024
situated, )
                )
          Plaintiffs, )
                )
     vs. )
                )
FIRST AMERICAN TITLE INSURANCE )
COMPANY, PACIFIC AMERICAN TITLE )
INSURANCE & ESCROW COMPANY, )
MANU MELWANI and DOES One (1) )
through Three Hundred and ninety-eight )
(298), inclusive, )
                )
          Defendants. )
                )

---

## CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S MEMORANDUM IN OPPOSITION TO CYFRED'S MOTION FOR CLASS CERTIFICATION

---

# ORIGINAL

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
**CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO CYFRED'S MOTION FOR CLASS CERTIFICATION**

COMES NOW Plaintiff, CYFRED, LTD. ("Cyfred"), and the proposed class ("Class"), by and through their counsel THE VANDEVELD LAW OFFICES, P.C., by Curtis C. Van de veld Esq. who hereby files this Reply to First American Title Insurance Company's ("First American") Memorandum in Opposition to Cyfred's Motion for Class Certification.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  RELEVANT FACTS

First American has misunderstood the allegations in the First Amended Class Action Complaint ("CAC") confusing the claims made exclusively by the Class with those made by Cyfred. The claims made by the Class center around First American's failure to obtain approvals from the Banking and Insurance Commissioner ("Commissioner") for First American's policy forms and rates, whereas, Cyfred's allegations are centered on First American's bad faith refusal to defend and indemnify Cyfred.

*CLASS CLAIMS*

First American did not obtain approval for the rates it charged Guam title insurance consumers, nor did it obtain approval for its rates. First American presents no competent evidence that it obtained the required approvals prior to 2005.[1] Even when First American did file a request for rate approvals in 2003, it did not submit its corresponding forms describing the insurance it intended to provide for the rates submitted. More importantly, First American

---

[1] In fact, at a hearing on February 8th 2008 on First American's Motion to Dismiss, First American confirmed fact that until 2005, First American could find no evidence, even after searching the Commissioner's files, that First American ever obtained rate and form approvals. Here is the exchange on the point between David Dooley and Judge Manibusan: "Judge: but does it get sent to the commissioner for approval though, once it's amended? Dooley: Yes (indiscernible). And Stewart did on a couple of occasions. (5:38) Unfortunately for First American I can't find anything in the insurance commissioner's files but that doesn't necessarily surprise you. (5:46) ....".

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO
CYFRED'S MOTION FOR CLASS CERTIFICATION
Case Case No. CV-CV-00024    Document 93    Filed 04/29/2008    Page 2 of 30

colluded with other title insurance companies in Guam to obtain their agreement on rates to be filed in 2003.[2] (*See*: "Van de veld Decl. at Exs. A & B").

*CYFRED'S CLAIMS*

Cyfred's damages are based in part on First American's failure and refusal to defend and indemnify Cyfred in *Sananap et al. v. Cyfred, Ltd. et al.*, Superior Court of Guam, Civil Case No.CV1448-02 ("Sananap Action").

First American implies that Cyfred was aware of a title dispute before it bought the Ruben title insurance policy. (F.A. Memo. at p. 2). Until October 2006, Cyfred had no reason to believe the issues surrounding the installation of utilities in the Gill Baza Subdivision implicated the title to any property in the Gill Baza Subdivision. (Ex. "F" hereto at p. 2). Judge Sukola, in the Sananap Action agreed. She wrote: "Defendant conveyed good title to Plaintiffs'... even if the land is missing a sewer line." (*See*: Ex. "B" hereto 14:25-26). Thereafter, on at least two (2) separate occasions Judge Sukola specifically ruled that the Sananap plaintiffs' claims of defective title were meritless. (*See*: Ex. "C" at p. 11 & Ex. "E" hereto pp. 14-18").

## II.     DISCUSSION

### A.  STANDARD OF REVIEW

First American asserted that Cyfred cited "old" inapplicable cases from the Ninth Circuit holding that a review of the merits is improper at the class certification stage. (F.A. Memo. pp. 3-4).  First American argued that the modern trend is to require a review of the merits prior to certification. *Id*. This position ignores the split between the circuits. In the Ninth Circuit, a merits inquiry at the class certification stage remains inappropriate. *Dukes v.*

---

[2] In its cover letter for its rate filing in November 2003, First American cynically referred to the competitive

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
**CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO CYFRED'S MOTION FOR CLASS CERTIFICATION**

*Wal-Mart, Inc.,* 474 F.3d 1214, 1227 (9th Cir.2007); *see also: In re Live Concert Antitrust Litigation,* 247 F.R.D. 98, 108 (C.D.Cal.2007) ("…the Ninth Circuit intended to preclude a weighing of evidence at the class certification stage.") and *L.H. v. Schwarzenegger,* 2007 WL 662463 (Slip Copy) (E.D.Cal.2007). ("[T]he court may not consider whether the party seeking class certification has stated a cause of action or is likely to prevail on the merits, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).").

## B. CYFRED HAS MET ALL THE REQUIREMENTS OF RULE 23(a)

1.      **Cyfred Has Established Numerosity:** First American has collected millions of dollars worth of premiums from Guam title insurance consumers since 1994. (Van de veld Decl. Exs. "I" through "T"). In its annual reports to the Commissioner, First American has declared direct premiums earned of $6,058,922. This amount represents about fourteen percent (14%) of the total premium charged. From 1994, First American collected approximately $43,278,014 in gross premiums. First American confirmed this significant revenue stream in the documents it submitted to the Commissioner for its rate approvals in November of 2003. (*See:* Van de veld Decl. Ex. "D'). In the course of this litigation, First American has admitted numerosity. First American's counsel wrote that "First American sold a few thousand title insurance policies on Guam during the period in question …". (See: Ex. "A" hereto at p. 2).

Between 1994 and the present time at least one hundred and eighty-four (184) claims were presented to First American. *Id.* First American accepted only seventy (70) of the submitted claims and is "investigating" or has denied the rest. *Id.* First American has undeniably denied at least 22 claims since1994. (*See:* Van de veld Decl. Ex. "D").

---

environment in the title insurance industry on Guam to support its request. (Van de veld Decl. Ex. "C").

--------------------------------------------------------------------Page   3

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO
CYFRED'S MOTION FOR CLASS CERTIFICATION
Case No. CV-07-00024     Document 93     Filed 04/29/2008     Page 4 of 30

When determining numerosity, 'a court may accept common sense assumptions.' (citation omitted). *Alberton v. Commonwealth Land Title Ins. Co.*, 247 F.R.D. 469, 476 (E.D.Pa.2008). Numerosity does not require an exact number. *Id.* A reasonable estimate of the class size is sufficient. *Mailloux v. Arrow Financial Services, LLC,* 204 F.R.D. 38, 41 (E.D.N.Y.2001). Indirect proof of numerosity is adequate and may be inferred from facts in the record. *Kornick v. Talley*, 86 F.R.D. 715, 718 (D.C.Ga.1980). The facts from which an inference of numerosity may be made can be established by affidavit. *Blihovde v. St. Croix County, Wis.,* 219 F.R.D. 607, 614 (W.D.Wis.2003). Cyfred has proved numerosity.

**2.** **Cyfred's Claims Are Common to the Class Claims:** First American argued that because of Cyfred's coverage allegations it cannot have common claims with the Class. (*See*: F.A. Memo. pp. 6-7). First American misunderstands the threshold requirements to establish commonality in the Ninth Circuit. "All questions of fact and law need not be common to satisfy the rule ... shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* "The commonality test is qualitative rather than quantitative-- one significant issue common to the class may be sufficient to warrant certification." *Dukes v. Wal-Mart, Inc.,* 474 F.3d 1214, 1225 (9th Cir.2007). Cyfred has alleged and presented more than one significant common legal theory or common fact in its motion for class certification. For instance, First American sold illegal tile insurance policies in Guam to the Class, and subclasses, and used a network of agents in Guam to sell these illegal void policies in order to collect illegal title insurance premiums. Moreover, Cyfred has purchased other title insurance policies from First American insuring title to property not in the Gill Baza Subdivision, and

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
**CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO CYFRED'S MOTION FOR CLASS CERTIFICATION**
Case Case No. 06-cv-00024    Document 93    Filed 04/29/2008    Page 5 of 30

thus, those policies are not subject to Gill Baza defenses. (Van de veld Decl. Exs. 'F" through "H").

**3.    Cyfred's Claims Are Typical of the Class Claims:** Cyfred's claims are typical of those made by the Class. "Typicality, …, is said to require that the claims of the class representatives be typical of those of the class, and to be 'satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'(citation omitted). *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir.2001). A Pennsylvania court recently found typicality where a scheme to charge illegal insurance premiums was alleged. The court held:

> To evaluate typicality, we ask whether the named plaintiffs' claims are typical, in common-sense terms, thus suggesting that the incentives of the plaintiffs are aligned with those of the class. [F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.' (citation omitted). (internal citations omitted). ' '[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct.' (citations omitted). "When a defendant engaged in a 'common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members.' " (citation omitted).

*Alberton v. Commonwealth Land Title Ins. Co.*, 247 F.R.D. 469, 476-477 (E.D.Pa.2008).

"[T]he Ninth Circuit interprets Rule 23(a)(2) typicality permissively. (citation omitted). Typicality requires that named plaintiffs be members of the class they represent and "possess the same interest and suffer the same injury" as class members. *Bates v. United Parcel Service*, 204 F.R.D. 440, 446 (N.D.Cal.2001).

**a. Cyfred is part of the class**. First American argued that its rates and forms were approved prior to Cyfred's purchase of the Ruben title insurance policy. (*See*: F.A. Memo. p.

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO CYFRED'S MOTION FOR CLASS CERTIFICATION

8). First American refers to Exhibits A to the Buck Decl. and to Exhibit F of the Alfred Decl.

submitted in support of their position. *Id*. Neither document referenced by First American,

contains any evidence of approvals for its rates and forms predating Cyfred's purchase of the

Ruben policy in February 2002. Moreover, First American's assertions that it obtained prior

approvals for its rates and forms are merits arguments best left for the jury to resolve.

**b. Cyfred has standing:** First American stated that Cyfred did not pay for the Ruben

policy. (*See*: F.A. Memo. p. 9). This assertion was plainly false. The Ruben policy costs were

debited to Cyfred's account and were paid from funds belonging to Cyfred. (*See*: Alfred Decl.

Ex. F).

Secondly, Cyfred and all other members of the Class have been defrauded of the

premiums they paid. Misrepresentations that induce a person to contract are sufficient to

establish a cause of action for damages. *Wholesalers Board of Adjusters v. Norton*, 13

Cal.App.2d 663, 666, 57 P.2d 552, 553 (Cal.App. 2 Dist.1936). Every contract incorporates

provisions of law into it and compliance with the law may be assumed. *Mary Pickford Co. v.*

*Bayly Bros.*, 12 Cal.2d 501, 519-520, 86 P.2d 102, 111 (CA.1939). A violation of the

insurance law is *per se* a deceptive act for which damages may be sought. *Vail v. Texas Farm*

*Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex.1988). Issuing insurance policies without

approved rates renders the policy void. 4 Holmes § 23.1. Unfilled insurance forms, absent a

penalty provision to discourage violations of law with impunity, are void. *Gershman v.*

*American Cas. Co. of Reading, PA*, 251 F.3d 1159, 1163 (8th Cir.2001).[3]

---

[3] Guam's Commissioner complained he was powerless to enforce rate filings in his 2005 Annual Report. He wrote: "It has been brought to the attention of the Banking and Insurance Board that the penalties for noncompliance with the approved rates and Guam Tariff pursuant to 22 GCA §18503 have been repealed by PL 13-187. Some admitted and most unlicensed companies do not follow the Guam Tariff and approved rates. My office cannot impose any penalty because my authority to impose penalty was taken away. I strongly recommend that the penalties that were repealed under PL 13-187 be reenacted." (Van de veld Decl. Ex. "E").

Cyfred and the Class purchased legally approved insurance policies and paid what they assumed were legally approved premiums. The Class is entitled to receive what they purchased - legal insurance policies and to be charged legally approved premiums. Few consumers, if any, would purchase illegal insurance policies or pay illegal premiums which have not received the benefit of a thorough review for fairness as required by the Insurance Law. The Class is entitled to receive a refund of the illegal premiums paid and to recover the incremental costs for obtaining legally approved policies and to be charged legally approved rates.

Moreover failure to obtain rate and form approvals is actionable by individuals purchasing title insurance policies because these consumers were the intended beneficiaries of the Insurance Law. *Moody v. U.S.*, 774 F.2d 150, 157 (6th Cir.1985).

**c. Cyfred's claims are not time barred**: Cyfred's claims are not time barred since First American fraudulently concealed its violations of the Insurance Law. Therefore, First American is estopped from asserting a statute of limitations defense. "[W]hen the defendant is guilty of fraudulent concealment of the cause of action the statute is deemed not to become operative until the aggrieved party discovers the existence of the cause of action." *Pashley v. Pacific Elec. Co.*, 25 Cal.2d 226, 229, 153 P.2d 325, 327 (1944). Cyfred did not confirm First American's violations of the Insurance Law until about the end of July 2007. (Van de veld Decl. Ex. "W"). Additionally, statute of limitations issues require resolution of the merits inappropriate at the class certification stage of the proceedings. *Foltz v. U.S. News & World Report, Inc.,* 106 F.R.D. 338, 341 (D.C.D.C.1984). Moreover, a statute of limitations defense does not defeat typicality when it is not limited to the named plaintiff or to a small number of

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO CYFRED'S MOTION FOR CLASS CERTIFICATION
Case Case 2:07-cv-00024 Document 93 Filed 04/29/2008 Page 8 of 30

the class. *Ludwig v. Pilkington North America, Inc.*, 2003 WL 22478842 *3 (Not Reported in F.Supp.2d,)(N.D.Ill.2003).

**d. Cyfred is a consumer**: Cyfred has net assets of less than $25,000,000. (*See*: Mendiola Decl.). The Deceptive Acts Subclass, by definition, includes only consumers – all others are excluded. The vast majority of individuals or businesses purchasing title insurance are consumers. First American can contest which claimants qualify as consumers and are entitled to a recovery in the damages portion of the trial. *Ballard v. Equifax Check Services, Inc.*, 158 F.Supp.2d 1163, 1171 fn 9 & 1172 (E.D.Cal.2001).

4.      **Cyfred Is an Adequate Class Representative**: Cyfred adequately represents the interests of the Class.

**a. Francis Gill is not the class representative**: First American argued that because Francis Gill, an officer of Cyfred, was convicted and pardoned for a remote conviction, disqualifies Cyfred from representing the Class. (*See*: Ex. "D" hereto).  First American presented no law to support its position that a remote conviction of an officer of a class representative disqualifies the employer corporation from acting as class representative. First American presented no facts to show that Mr. Gill "controls" Cyfred. In any event, a remote felony conviction does not disqualify any person from representing a class. *White v. E-Loan, Inc.*, 2006 WL 2411420 *3 (Not Reported in F.Supp.2d) (N.D.Cal.2006).

**b. Cyfred has no conflicts with the Class**: First American cites no case authority to support its position that a difference in another action with some class members constitutes a conflict in the current action. Indeed both Cyfred and the Sananap plaintiffs have been similarly defrauded by First American, and therefore, have co-extensive interests in this action. Furthermore, First American fails to cite a single case supporting its theory that

alternative allegations in the CAC creates a conflict of interest. First American also argued that the allegations in the CAC will require settled claims to be relitigated, therefore creating a conflict. First American has not carefully read the class exclusions in the CAC which specifically excludes insurance claimants, with validly released claims against First American, from the Class. (CAC ¶43).

**c. Class counsel is adequate**: First American has presented no facts to show that class counsel has failed to adequately litigate the matters at issue in this action. Class counsel has extensive experience and is adequate.

## C. CYFRED HAS MET THE REQUIREMENTS OF RULE 23(b)

Cyfred has met all the requirements of either Rule 23 (b)(1) or (b)(3). The court must select the most appropriate subsection for certification. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163 (1974); *Jefferson v. Ingersoll International Inc.,* 195 F.3d. 894, 898 (7th Cir.1999).

**a. Cyfred has met the requirements of Rule 23(b)(1)**: None of the cases cited by First American involved illegal conduct underpinning the class certification under Rule 23(b)(1). Rule 23(b)(1) certification is appropriate when illegal conduct is alleged and the resolution of which is dispositive of the defendant's liability to the entire class. *Becher v. Long Island Lighting Co.,* 164 F.R.D. 144, 153 (E.D.N.Y.1996) *see also: Helms v. Local 705 Intern. Broth. of Teamsters Pension Plan,* 1998 WL 182513 (Not Reported in F.Supp.) (N.D.Ill.1998). Moreover, Rule 23(b)(1) certification is not exclusively applied to limited fund cases. *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295 (1999). The CAC claims are predicated on First American's illegal conduct perpetrated against the entire Class.

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO
CYFRED'S MOTION FOR CLASS CERTIFICATION
Case 1:07-cv-00024    Document 93    Filed 04/29/2008    Page 10 of 30

**b. Cyfred Has Met its Burden Under rule 23(b)(3)**: Class claims predominate when a fraud is committed against numerous persons by similar means or misrepresentations despite individual issues concerning damages. *In re Fedex Ground Package System, Inc., Employment Practices Litigation*, 2007 WL 3027405 *13 (Slip Copy)(N.D.Ind.2007). For the Denied Claims Subclass, there are no issues of individual liability since the policies issued to this subclass are void and First American is liable for all the resulting consequential damages. And this small subclass's claims are manageable in a class action. Each year First American filed affidavits of compliance certifying that it was in compliance with the Insurance Law. All members of the Class and the two subclasses relied on these perjured affidavits which effectively concealed First American's illegal conduct. Thus, any estoppel argument tolling the statute of limitations is applicable to the entire class and First American's statute of limitations arguments do not defeat predominance. *Fedex*, 2007 WL 3027405 *26. Reliance issues do not defeat predominance of class issues where consumer fraud is alleged based on pervasive illegal conduct. *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2nd Cir.2005); *Upperman v. Grange Indemn. Ins. Co.*, 135 Ohio Misc.2d 8, 16, 842 N.E.2d 132, 138 (2005). Finally, the Commissioner's office is not organized to handle the thousands of small claims represented by the CAC and no special expertise of the Commissioner is required to do so. (Van de veld Decl. Ex. "U").

Dated this 29th day of April 2008.

THE VANDEVELD LAW OFFICES, P.C.

Curtis C. Van de veld, Esq.
Attorney for Plaintiffs

CYFRED, LTD. et al., v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants
CYFRED, LTD.'S REPLY TO FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO
CYFRED'S MOTION FOR CLASS CERTIFICATION

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant
First American Title Insurance Company



JAN 2 4 2008

JEANNE C. QUINATA
Clerk of Court

IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| CYFRED, LTD., for itself and on behalf of other similarly situated, | ) ) ) | CIVIL CASE NO. 07-00024 |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | **DEFENDANT FIRST AMERICAN TITLE INSURANCE COMPANY'S RESPONSE MEMORANDUM re: JURISDICTION OF THE DISTRICT COURT OF GUAM** |
| FIRST AMERICAN TITLE INSURANCE COMPANY, PACIFIC AMERICAN TITLE INSURANCE COMPANY, MANU MELWANI and DOES One (1) through Two Hundred and Ninety-Eight (298), inclusive, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## I.    INTRODUCTION

At a hearing in this action on January 7, 2008, the Court instructed the parties to file supplemental briefing on the issue of jurisdiction, with plaintiff Cyfred, Ltd. ("Cyfred") to file the opening brief on the issue. Cyfred has done so. Defendant First American Title Insurance Company ("First American") responds to Cyfred's opening memorandum on the jurisdictional issue as follows. To summarize, the Court does not have diversity jurisdiction in this matter. The court should exercise its discretion to decline to hear Cyfred's RICO claim and Guam law claims because the primary issues in this case are issues of local law and local concern.

1



## II.   FACTS

First American does not disagree with the first two paragraphs of Cyfred's statement of the facts.[1]  As to the third and concluding paragraph of Cyfred's statement of facts, First American does not disagree that Cyfred made RICO allegations in the First Amended Class Action Complaint ("FACAC").   First American disagrees with Cyfred's characterization of these allegations as "central allegations in the Complaint".  The "centrality" of these peripheral matters is a legal issue which will be discussed below.

Cyfred has asserted, and First American does not dispute, that the sole named plaintiff, Cyfred, is a citizen of Guam for diversity purposes.  Cyfred has asserted, and First American does not dispute, that First American is a citizen of California for diversity purposes.   Cyfred has identified First American's co-defendants, Pacific American Title Insurance Company ("PATCO") and Manu Melwani ("Melwani") as citizens of Guam for diversity purposes.  FACAC at ¶¶ 9-10.

There has been no allegation as to the citizenship of class members other than Cyfred.  As a practical matter, it is most likely impossible for the parties to provide precise numbers as to what percentage of class members are citizens of Guam in the near future.  First American sold a few thousand title insurance policies on Guam during the time period in question, from 1994 to the filing of this action in 2007.  The policies contain the address of the insureds.  However, citizenship for purposes of diversity is determined at the time an action is commenced, not on the date that the events giving rise to the suit occurred.  *E.g.,* Lew v. Moss, 797 F. 2d 747, 750 (9th Cir. 1986); 15-102 Moore's Federal Practice-Civil §102.32 (2007).  During the 13-year time period at issue, some insureds may have relocated off-island.   Others may have passed away.  It would take an investigator some time to track down all of the insureds and, where necessary, their heirs, especially

---

[1] In regards to the second paragraph, First American would note that it is only admitting that Cyfred has made these assertions and allegations.  First American is not conceding the truth of any such assertion or allegation.

2

when starting with only a name, an old address, and the information that the individual at one time had an interest in certain real property. Notwithstanding the difficulties involved in providing a precise number at this time, it is nonetheless intuitively obvious that the overwhelming majority of persons who obtain title insurance on Guam, and who thus have interests in real property on Guam, will be citizens of Guam for purposes of diversity. Sara C. Pangelinan, who has been an Escrow Officer at PATCO since 1992, states that the overwhelming majority of persons who purchased title insurance from PATCO, 96.72% in a random sample from the years at issue in this action, were Guam residents. Declaration of Sara C. Pangelinan, filed herewith.

## III.    LEGAL ISSUES

This Court does not have diversity jurisdiction over this matter under 28 USC §1332(d) because the overwhelming majority of the plaintiffs are Guam residents, two of the three defendants are Guam residents, the class seeks substantial relief from Guam defendants, and the principal injuries alleged occurred on Guam. The Guam courts have concurrent jurisdiction over Cyfred's RICO claim. Given the overwhelming predominance of local issues, pursuant to both <u>Tafflin v. Levitt</u>, 493 U.S. 455, 110 S. Ct. 792 (1990) and 28 USC §1367(c), the Court should abstain from hearing the RICO claim and decline supplemental jurisdiction over the 12 purely local causes of action.

### A.    <u>This Court does not have diversity jurisdiction over this matter under 28 USC §1332(d).</u>

Plaintiff Cyfred bears the burden of proving that diversity jurisdiction exists. *E.g.*, <u>Thompson v. Gaskill</u>, 315 U.S. 442, 446 (1942); <u>Boggs v. Blue Diamond Coal Co.</u>, 432 F. Supp. 19, 21 (E.D. Tenn. 1977); <u>National Spinning Co. v. Washington</u>, 312 F. Supp. 958, 961 (E.D.N.C. 1970); <u>Shreveport Long Leaf Lumber Co. v. Wilson</u>, 38 F. Supp. 629, 631 (W.D. La. 1941) (burden on plaintiff to show diversity by preponderance of evidence even though issue raised by defendant

3

**IN THE SUPERIOR COURT**

**OF GUAM**

KINI B. SANANAP, IOWANA M.          )
SANANAP, and THE 40 LOT OWNERS[1]    )     CIVIL CASE NO. CV1448-02
(OF THE 33 OTHER GILL-BAZA           )
SUBDIVISION LOTS),                   )
                                     )
                     Plaintiffs,     )
                                     )
            vs.                      )
                                     )     **FINDINGS OF FACT AND**
                                     )     **CONCLUSIONS OF LAW**
CYFRED, LTD., A Guam Corporation,    )     (Temporary Restraint Order)
ENRIQUE BAZA, JR. (deceased),        )
ELEANOR B. PEREZ, DONGBU             )
INSURANCE COMPANY and DOE            )
DEFENDANTS 1 - 10,                   )
                                     )
                     Defendants.     )
_____)

**INTRODUCTION**

This ex parte matter came before the Honorable Anita A. Sukola on October 2, 2006. It is one of many motions in this case. In this particular matter, Plaintiff Kini B. Sananap, Plaintiff Iowana M. Sananap, and the 40 Lot Owners-Plaintiffs ("Plaintiffs") move the Court for a temporary restraining order ("TRO") to enjoin foreclosure sales, collections, and evictions. Plaintiffs wish to restrain Defendant Cyfred, Ltd. ("Defendant") from "initiating, instituting, or pursuing" collection and foreclosure proceedings on any of the Plaintiffs' lots at the Gill-Baza Subdivision. Attorneys Alicia A. Limtiaco and Donna M. Cruz were present for Plaintiffs (Attorney Wayson Wong has also been representing Plaintiffs but was not present) while Attorney Curtis C. Van de Veld was present for Defendant. The Court took the matter under advisement in order to give full consideration to all the issues at subject. Now, taking all memoranda, declarations, and arguments into account, the Court issues this Decision and Order.

---

[1] More specifically: Sinfiano S. Soni, Divina Vaiau, Fine Indonesio, Serena Tiron Tithmed, David Waathdad, Stanley Yanfag, Raymond Martin, Rainis Rangi, Lynn Otiwii, Gabriel Baffel and Angelina Gurungin, Tnel Mori. Alex Ruben, Rose Ifram, Anis Sino, Margaret Yagatina and Junior Yowl, Harper Kimiena, Smither Ezra. John Lignaw, Joshua Peter and Daisy Narruhn, Marsala D. Martin, Christopher Nero, Alejo J. Untalan and Redsa Menas. Albert Kinasira, Santiago T. Wai and Dolores O. Wai, Martin Sontag, Renspar B. Alpert and Lasda R. Alpert. Martin Loretta, Justina Hartman, Sammy K. Sharep, Daria Kosam Tongan, Jennifer Topacio, Paul Kargon and Martina Rueman, AND Margaret L. Fanoway.



## FINDINGS OF FACT

Taking all memoranda, declarations, arguments, and evidence into consideration, the Court finds by a preponderance of the evidence that:

1. Plaintiffs claim to be home owners who purchased empty lots at the Gill-Baza Subdivision from developer-Defendant. Some Plaintiffs have shown Warranty Deeds supporting their claim of ownership and some have not.

2. On November 8, 1999, Kini B. Sananap and Jimmy C. Camacho (for Cyfred, Ltd.) signed a Land Purchase Agreement. In that Land Purchase agreement, Plaintiffs Sananaps agreed to pay a deposit of $950.00, to pay an overall purchase price of $39,500.00, and to sign a Promissory Note and Mortgage all for ownership of Lot 24, Block 1, Tract 63004 at the Gill-Baza Subdivision. (Land Purchase Agreement, Exhibit A to Memorandum in Support of Motion to Dissolve on September 11, 2003). The Land Purchase Agreement said, "Seller shall convey the subject property to the buyer via a warranty deed. Buyer shall execute a promissory note, and mortgage with private power of sale in favor of the seller to secure the balance of the purchase price owed at the interest rate in item #4 listed above. Seller and Buyer shall execute a contract of sale."

3. The reason why one of Plaintiffs Sananaps' obligations was to sign a promissory note and a mortgage was because they needed to borrow money in order to purchase Lot 24.

4. On December 30, 1999, the Promissory Note was executed. For a total loan of $38,550.00 ($39,500.00 minus the paid deposit of $950.00) from Defendant, Plaintiffs Sananaps agreed to pay Defendant $396.53 until the principal was paid off. Both Kini B. Sananap and Iowana M. Sananap signed the Promissory Note. The Promissory Note says,

> For value received, by , [sic] Kini B. Sananap . . . and Iowana M. Sananap . . . promises [sic] to pay to the order of Cyfred, Ltd. . . . the principal sum of thirty-eight thousand five hundred fifty dollars ($38,550) in lawful money . . . The principal amount of this Note, together with interest thereon, shall be repaid in three hundred ninety-six dollars and fifty-three cents ($396.53) each . . .

2

commencing on the 30th day of January, 2000, and continuing on the same day of each consecutive month thereafter until the entire remaining unpaid balance of this Note and all interest accrued and any other amounts due thereon has been paid in full.

(Promissory Note at 1, Exhibit B to Memorandum in Support of Motion to Dissolve on September 11, 2003).

5. The Promissory Note signed on December 30, 1999 clearly gives the right to Defendant to foreclose in the event of a default. It says,

In the event of the happening of any one or more of the following events, any one of which shall constitute an event of default to wit: a. the non-payment of any sums payable hereunder within five (5) days of when due . . . then this Note and all sums due hereunder shall immediately become due and payable in full, without further demand or notice to Maker and Holder may commence action to foreclose any mortgage or security which secures this Note.

(Promissory Note at 2, Exhibit B to Memorandum in Support of Motion to Dissolve on September 11, 2003).

6. The Mortgage also gives Defendant the right to foreclose. The Mortgage was executed around the same time as the Promissory Note. It was signed by Kini B. Sananap and Iowana M. Sananap on December 30, 1999, signed by Geraldine Mendiola (representative of Cyfred, Ltd.) on January 3, 2000, and recorded on January 4, 2000 at 3:06 p.m. (Mortgage with Private Power of Sale, Exhibit C to Memorandum in Support of Motion to Dissolve on September 11, 2003). The Mortgage says,

If one or more of the following events of default shall happen, that is to say: a. Monetary Default. If default be made in the payment of the said Promissory Note, or in any part thereof or of any other monies provided herein or in the Promissory Note to be paid by said Mortgagor or any part thereof the same shall become due and payable . . . g. . . . then an in every such case Mortgagee shall have the right, at its option, to declare the Promissory Note . . . immediately due and payable without further notice, and no waiver of this right shall be effective unless in writing and signed by Mortgagee.

(Mortgage at 6, ¶ 8, Exhibit C to Memorandum in Support of Motion to Dissolve on September 11, 2003).

3

7. On January 3, 2000, Geraldine Mendiola signed the Warranty Deed granting ownership of Lot 24 to Plaintiffs Sananaps. On December 39, 1999, Plaintiffs Sananaps signed a Warranty Deed Rider acknowledging their rights as to water and power.

8. On April 4, 2000, Plaintiff Renspar Alpert (one of the 40 Lot Owners-Plaintiffs joined) and Iasinda R. Alpert (who was never joined as a party in this case) signed a Land Purchase Agreement for Lot 6 Block 2. (Attachment to June 3, 2006 Declaration). However, the copy in the Court's record was never signed by Defendant. The purchase price was set for $34,500.00 and Plaintiff Alpert's deposit was for $950.00. It appears a Promissory Note and Mortgage were also intended to be signed if this transaction was indeed completed.

9. On April 10, 2000, Plaintiff Martin Sontag (one of the 40 Lot Owners-Plaintiffs joined) and Herson E. Martin (who was never joined as a party in this case) signed a Land Purchase Agreement for Lot 8 Block 3. (Attachment to June 3, 2006 Declaration). Geraldine Mendiola signed it for Defendant. The purchase price was for $39,500.00 and a $500.00 deposit was made. It appears a Promissory Note and Mortgage were also signed.

10. On October 26, 2000, Plaintiff Stanley Yanfag (one of the 40 Lot Owners-Plaintiffs joined) signed a Land Purchase Agreement for Lot 22 Block 1. (Attachment to June 3, 2006 Declaration). Kamlesh Sherma signed it for Defendant. The purchase price was for $39,500.00 and there was no deposit. It appears a Promissory Note and Mortgage were also signed.

11. On January 12, 2001, Plaintiff Anis Sino (one of the 40 Lot Owners-Plaintiffs joined) signed a Land Purchase Agreement for Lot 33, Block 1. (Attachment to June 3, 2006 Declaration). Kamlesh Sherma signed it for Defendant. The purchase price was for $42,500.00. Plaintiff Sino did not make a deposit. It appears a Promissory Note and Mortgage were also signed.

12. On September 4, 2001, Plaintiff Raymond Martin (one of the 40 Lot Owners-Plaintiffs) and Inocenta Raymond (who was never joined as a party in this case) signed a Land

4

Purchase Agreement for Lot 15 Block 1. (Attachment to June 3, 2006 Declaration). Kamlesh Sherma signed it for Defendant. The purchase price was for $39,500.00. Plaintiff Martin did not make a deposit. It appears a Promissory Note and Mortgage were also signed.

13. On November 1, 2001, faced with the threat of foreclosure, Plaintiffs Sananaps agreed to a new payment arrangement with Defendant. (Memorandum on November 1, 2001, Exhibit D to Memorandum in Support of Motion to Dissolve on September 11, 2003). Plaintiffs Sananaps signed the Memorandum as did Geraldine Mendiola for Defendant. Defendant agreed to not foreclose on the Property and to install a sewer and water line within 24 months. Plaintiffs Sananaps agreed to pay $787.25 on November 1, 2001 and to pay a total of $260.00 every month starting on November 28, 2001.

14. The November 1, 2001 Memorandum is a void contract as it was not lawful. 18 G.C.A. § 85102 ("It is essential to the existence of a contract that there should be: 1) parties capable of contracting, 2) their consent, 3) a lawful object, and 4) a sufficient cause or consideration."). It was illegal because under 21 G.C.A. § 60314(h), developers cannot waive their duty to provide sewer and water. As this contract was void, the Promissory Note and Mortgage continue to be the governing authorities as to a default issue.

15. In March, 2002, with the advice of attorney Wayson Wong, Plaintiffs Sananaps stopped making payments to Defendant on their mortgage and have not made any payments since.

16. On April 26, 2002, Plaintiffs' attorney Wayson Wong wrote a letter to Mr. Francis Gill, President of Defendant. In that letter he says,

> I am the attorney for the [sic] Mr. and Mrs. Kini Sananap. They purchased Lot 1, Block 24 of Tract 63004 from your company, Cyfred, Ltd. I believe that Cyfred has been in default with respect to that sale since the date of that sale. Accordingly, I have advised my clients that they have no further obligation to pay it under the note and mortgage they signed.

(Breach of Warrant Letter, Exhibit C to Verified Complaint).

5

17. On June 21, 2002, Defendant threatened to proceed with Plaintiffs Sananaps' foreclosure and scheduled a foreclosure sale. Soon after, Defendant agreed to postpone foreclosure until after the litigation of this matter.

18. Five months after Wayson Wong's letter, on September 27, 2002, Plaintiffs Sananaps filed a Verified Complaint. An Amended Complaint was filed on May 25, 2006 when other Plaintiffs were added. In both complaints, claims are based on a variety of arguments: under Count One, there is a claim based on the breach of developer duties under 21 G.C.A. § 60314; under Count Two, there is a claim based on false statements in violation of the Trade Practices and Consumer Protection Act of 5 G.C.A. § 32; under Count Three, there is a claim to temporarily restrain Defendant from foreclosing on any lots under 5 G.C.A. § 32119; and under Count Four and Five, there is a claim for a breach of promise to the Department of Land Management which was made on Agricultural Subdivision Survey Map of Tract 63004. (Verified Complaint and Amended Complaint).

19. On November 4, 2002, Defendant filed an Answer and Counterclaim. They filed an Amended Answer and Counterclaim on June 12, 2006 after new parties were joined by Plaintiffs. In its Amended Counterclaim, Defendant states,

> 7. Defendant Cyfred, Ltd. alleges as to all Plaintiffs, that all of the respective Plaintiffs entered into contracts for the purchase of real property from Defendant Cybred, to make payments on a monthly installment basis, that the Plaintiffs have failed to pay the installments for the sums due, and pursuant to the respective Promissory Notes, Mortgages, Land Purchase Agreements, or other contracts of the parties and that based on the failure to pay, Defendant Cyfred has accelerated the amounts therein due which sums have not been paid to Cyfred by Plaintiffs. 8. Based on the failure of the Plaintiffs to pay, Defendant is entitled to foreclose upon the Plaintiffs and recovery [sic] the property and damages as allowed by law.

(Amended Answer and Counterclaim at 2).

20. On October 8, 2003, Defendant filed a Motion to Dismiss claiming that 21 G.C.A. § 60314 applies only to conveyances of unregistered parcels of property.

21. On January 2, 2004, Defendant filed a Motion for Summary Judgment. Defendant

6

argued that the Complaint, having been filed on September 27, 2002 almost an entire year before the twenty-four months passed, was early and premature and should not have been filed until after November 1, 2003.

22. On February 9, 2004, Judge Manibusan issued a Decision and Order. Judge Manibusan held that 21 G.C.A. § 60314 applies to conveyances of registered and unregistered parcels of property.

23. On November 29, 2005, this Court issued a Decision and Order in regard to the Motion for Summary Judgment. In the Decision and Order, this Court re-affirmed Judge Manibusan's ruling in regard to the application of 21 G.C.A. § 60314 to this case. (Decision and Order at 6). The Court also held, "The Court finds that Plaintiffs do allege deception sufficiently for the claims under 5 G.C.A. § 32201 to remain, that there is a genuine issue of material fact as to all the counts in the Verified Complaint, and that summary judgment is therefore appropriate." (Decision and Order at 7).

24. On March 14, 2006, Plaintiffs Sananaps filed a Motion for Preliminary Injunction.

25. Also on April 5, 2006, Plaintiffs Sananaps filed a Motion for Partial Summary Judgment. They asked, "...to recover the cost to construct the sewer and proper waterlines for their Lot 24 of Block 1, at the Gill-Baza Subdivision in the amount of $720,000 or such amount that this Court determines to be proper, together with all of their attorney's fees and costs to date with respect to that claim..." (Motion at 1).

26. At a hearing on May 4, 2006, the Court announced that it would grant a joinder of the 40 Lot Owners-Plaintiffs but deny a joinder of UPIC. A written Decision and Order was issued on May 5, 2006.

27. On June 5, 2006, Plaintiffs filed an Ex Parte Motion for a TRO.

28. Some time after that motion in June, 2006, an oral agreement was made in this Court that Defendant would not proceed with foreclosure or collection efforts for ninety days - from

7

June 11, 2006 until September 12, 2006.

29. On June 12, 2006, the Court issued its Findings of Fact and Conclusions of Law as to Plaintiffs Sananaps and the Motion for Partial Summary Judgment. The Court agreed that Plaintiffs Sananaps were entitled to a monetary recovery under 21 G.C.A. § 60314(f)(2) but the Court did not have enough evidence to specify what amount.

30. On July 10, 2006, the parties met to discuss the Second Motion for Partial Summary Judgment.

31. On August 1, 2006, the Court issued its Findings of Fact and Conclusions of Law in regard to the Second Motion for Summary Judgment. In that Order, the Court found Defendant liable for $580,000.00 for the failure to provide a sewer line at the Gill-Baza Subdivision and also found that, in addition to Plaintiffs Sananaps, Stanley Yanfag, Raymond Martin, Anis Sino, and Martin Sontag were also entitled to money. The Court also ordered Defendant to pay $125,314.43 in attorneys' fees.

32. A judgment in favor of Plaintiffs was entered on August 24, 2006 and an amended judgment was entered on September 22, 2006. (Notice of Entry, September 22, 2006). The judgment calls for Defendant to pay Plaintiffs a total of $580,000.00 for a sewer line that was never constructed and a total of $125,314.43 in attorneys' fees.

33. On September 12, 2006, the agreed-to forbearance period terminated.

34. Plaintiffs claim that Defendant published notices in the Marianas Variety Guam Edition on September 18, 2006 regarding its intent to sell certain lots at the Gill-Baza Subdivision. (Memorandum at 5). Some Plaintiffs claim they are faced with a Notice of Sale and some claim they are faced with a Notice of Termination. (Document List, Exhibit A to Memorandum). The Court is unaware as to what is stated in the notices and as to any other details about the notices because such notices were not included as part of the motion papers filed on September 29, 2006.

8

35. A Notice of Appeal (as to the Court's prior decisions) was filed by Defendant on September 22, 2006.

36. Plaintiffs are currently in the process of executing on the judgment but a delay appears imminent as other issues remain and as Defendant pursues an appeal.

37. Plaintiffs filed a Motion for a TRO on Foreclosure Sales on September 29, 2006.

38. Plaintiffs and Defendant met in the Court for the Ex Parte TRO hearing on October 2, 2006. No witnesses testified.

39. Plaintiffs tried to admit the notices of default as evidence even though they were not filed with the other motion papers.

40. There is a lot of confusion in regard to Plaintiffs. Plaintiffs had the duty to sort that confusion out and did not. The Court is unclear as to which Plaintiffs currently own lots at the Gill-Baza Subdivision[2], which Plaintiffs are dealing with foreclosure[3], and which Plaintiffs are no longer at the Gill-Baza Subdivision. The Court is also unclear as to which Promissory Notes are with Defendant and which ones are with other parties.

## CONCLUSIONS OF LAW

The Court has jurisdiction to rule on this matter under 7 G.C.A. § 3105. The Court addresses the issue of the TRO first, the foreclosure issue second, and sanctions third.

### I. TRO

On September 22, 2006, a judgment was entered for Plaintiffs in the amount of

---

[2] Bobbie Reyes' Declaration indicates there are six persons listed as Plaintiffs who may not even have a right to be Plaintiffs because it is unclear whether and how they own a lot at the Gill-Baza Subdivision. (Bobbie Reyes Declaration filed October 2, 2006 at ¶ 5).

[3] In their Memorandum, Plaintiffs state, "[F]ollowing is a list of those residents of twenty-one (21) lots who have since received either a notice of delinquency or default . . . ." (Memorandum at 2). Plaintiffs went on to list 34 lots. (Memorandum at 2 through 4). Then, in Plaintiffs' Exhibit A Document List, it shows that 16 Plaintiffs have received notices. (Exhibit A to Memorandum). However, Stanley Yanfag, President of UPIC, states in his Declaration that 30 residents and 15 lots have received notices. (Exhibit C to Memorandum at ¶ 3).

9

$580,000.00 (for a sewer line) and $125,314.43 (for attorneys' fees). The judgment was based on Defendant's breach of 21 G.C.A. § 60314; Defendant sold numerous lots as a developer and then failed to provide a sewer line to the lot buyers as required by Guam law. Now, Plaintiffs are trying to collect on that money judgment. However, as they have attempted to proceed, an expected problem has arisen: Defendant has started the foreclosure process on all of Plaintiffs lots for their failure to make payments on their mortgages. Some Plaintiffs have not made mortgage payments since 2002.

As a solution to this new problem, Plaintiffs are asking the Court to issue a TRO in order to stop all collections and foreclosures. Plaintiffs seek a TRO not under Rule 65(b) but under 5 G.C.A. § 32119 of the Deceptive Trade Practices and Consumer Protection Act. ("DTPCPA"). (Memorandum at 8; Attorney Limtiaco on October 2, 2006).[4] The current issue is whether the Court should grant Plaintiffs a 5 G.C.A. § 32119 TRO and restrict Defendant from "initiating, instituting, or pursuing" collection and foreclosure proceedings.

Unfortunately, there was no discussion of what the test for this TRO would be even though TROs were the whole focus of this motion. All that 5 G.C.A. § 32119 states is, "The complaining party need not show that there is no remedy available at law and need not show irreparable damage if injunctive relief is not granted, *but need only show that a violation of this chapter has occurred or is likely to occur.*" (emphasis added). Typically, the test for a TRO would be the same test used for preliminary injunctions[5] which is whether there is a likelihood of success of the claim on the merits and the possibility of irreparable injury or whether there are serious questions and the balancing of hardships tips in favor of the moving party. HongKong

---

[4] Although the Court notes that in the very first line of its Legal Analysis, Plaintiffs state, "This motion is brought pursuant to . . . GRCP 65(b)." (Memorandum at 7).

[5] Triple J Enterprises, Inc. v. Grand Pacific Development, Inc., CV404-05 at 3 (Upingco 2005); see also Brown Jordan Intern., Inc. v. Mind's Eye Interiors, Inc., 236 F.Supp.2d 1152, 1154 (D.Hawaii, 2002).

10

Shanghai Bank Corp v. Kallingal, 2005 Guam 13, ¶ 18; see also Carlson v. Guam Telephone Authority, 2002 Guam 15, ¶ 1; see also Stuhlbarg Intern. Sales Co., Inv. v. John D. Brush and Co., Inc., 240 F.3d 832, 840 (9th Cir. 2001). The Court is not clear whether a 5 G.C.A. § 32119 TRO would apply the same requirements of a Rule 65(b) TRO.

Whatever the true test may be here, though, the Court is certain that a TRO is not appropriate for the following reasons.

### A. There Was No Showing of a Violation of the DTPCPA

For a TRO under 5 G.C.A. § 32119, at the very least, Plaintiffs had to show a violation of the DTPCPA. 5 G.C.A. § 32119 clearly states, "The complaining party . . . need only show that a violation of this chapter has occurred or is likely to occur."

Plaintiffs did not prove a violation in court on October 2, 2006, they did not indicate with clarity which DTPCPA statute was violated or how it was violated, and they barely allege anything in regard to this required violation element in their Memorandum. In their Memorandum, they merely state, "Cyfred's false statements and promises concerning the availability of water and sewer are a violation of 5 G.C.A. Chapter 32 . . . .".

The conclusory nature of this claim and the lack of proof or evidence as to a DTPCPA violation is the main reason why this Court denies Plaintiffs' request for a TRO under 5 G.C.A. § 32119.

### B. A 5 G.C.A. § 32119 TRO to Stop Foreclosure is the Wrong Remedy

If there were any DTPCPA violations, it can be presumed they were probably related to some of the promises made by Defendant in regard to sewer lines. But even if such violations were shown, the Court is unclear how a TRO to stop a foreclosure would protect anything as to those promises. Promises were made by Defendant as a developer and as a seller in the Land Purchase Agreements. If Defendant indeed proceeds with the foreclosure process, it will be doing so on a separate claim - the counterclaim. Defendant will be pursuing a foreclosure in its capacity

11

as a lender-mortgagee under the Mortgage and the Promissory Note - a completely different contract. Since Plaintiffs have breached[6] the Mortgage and Promissory Note and since Defendant has not, there is absolutely no reason why a foreclosure should be stopped.[7] A debtor-mortgagor cannot refuse to pay the lender-mortgagee just because the developer-seller has breached a duty to him.

### C. A Rule 65(b) TRO is Inappropriate, Too

A Rule 65(b) TRO would seem more appropriate to stop a foreclosure sale[8] but the Court is equally reluctant to issue a TRO under Rule 65(b).

TROs typically require a showing of the likelihood of success of the complaint on the merits and a showing of the possibility of irreparable injury (which was apparently made obsolete by 5 G.C.A. § 32119). HongKong Shanghai Bank Corp v. Kallingal, 2005 Guam 13, ¶ 18; see also Carlson v. Guam Telephone Authority, 2002 Guam 15, ¶ 1; see also Stuhlbarg Intern. Sales Co., Inv. v. John D. Brush and Co., Inc., 240 F.3d 832, 840 (9th Cir. 2001). Here, neither element is present (nor is the Rule 65(c) requirement to post a bond).

### 1. Possibility of Irreparable Injury

---

[6] Or atleast it appears they have breached the Mortgage and Promissory Note if their loan terms are anything like Plaintiffs Sananaps'. Plaintiffs Sananaps' Promissory Note says, "The principal amount of this Note . . . shall be repaid in three hundred ninety-six dollars and fifty-three cents ($396.53) each . . . continuing . . . until the entire remaining unpaid balance of this Note and all interest accrued and any other amounts due thereon has been paid in full." (Promissory Note at 1, Exhibit B to Memorandum in Support of Motion to Dissolve on September 11, 2003) Thus, when Plaintiffs Sananaps failed to meet this payment obligation, they were in breach.

[7] Plaintiffs Sananaps' Promissory Notes says, "In the event of the happening of any one or more of the following events, any one of which shall constitute an event of default to wit: a. the non-payment of any sums payable hereunder within five (5) days of when due . . . then this Note and all sums due hereunder shall immediately become due and payable in full, without further demand or notice to Maker and Holder may commence action to foreclose any mortgage or security which secures this Note." (Promissory Note at 2, Exhibit B to Memorandum in Support of Motion to Dissolve on September 11, 2003). Clearly, the Promissory Note allows Defendant to proceed with a foreclosure.

[8] In the first line of the Legal Analysis in the Memorandum, Plaintiffs did say, "This motion is brought pursuant to . . . GRCP 65(b)." (Memorandum at 7).

12

3

If Plaintiffs had shown a real possibility of an irreparable injury (foreclosure and being homeless) as opposed to just a potential, perhaps they would have met this element[9]. But they did not present any of the notices.[10] Without reading the notices itself, the Court was unable to make a determination as to how serious of a threat a foreclosure is. Without seeing any of the notices, the Court could only presume there is a potential for foreclosure. Case law indicates that a potential injury is not sufficient for a TRO. See, e.g., Churchill Village, LLC v. General Electric Company, 169 F.Supp.2d 1119, 1129 (N.D.Cal. 2000).

### 2. Likelihood of Success on the Merits

Under HongKong and Carlson, in order for Plaintiffs to obtain a TRO, Plaintiffs would have to show a likelihood of success; that is, they would have to show a likelihood of success or a solid legal basis for preventing a foreclosure against them. In regard to future foreclosure actions which may be pursued by Defendant, Plaintiffs argue that they are not in default because Defendant first breached the contractual relationship by not building a sewer system. (Memorandum at 5). They rely on Arthur D. Little, Inc. v. Dooyang Corporation, 147 F.3d 47 (1998) and Marriott, et al. v. Harris, 368 S.E.2d 225 (1988). (Memorandum at 8). They state that they are excused from making any payments until sewer and water lines have been installed. (Memorandum at 5).

The Court holds that there is no likelihood of success in any of Plaintiffs' arguments because they have no legal basis. These arguments have serious flaws.

First, Plaintiffs' arguments fail to grasp the true nature and extent of the relationship between Plaintiffs and Defendant. In effect, there are two different contracts at issue in this case

---

[9] Although with the right of redemption under 7 G.C.A. § 23124, a good argument would have to be made.

[10] Plaintiffs did not include the notices of default with the motion papers that were filed. Instead, they tried to enter the notices during the hearing. Defendant objected and the notices never came into evidence.

13

and Plaintiffs were the first to breach the contract at issue in this motion. In other words, when each Plaintiff bought a lot off of Defendant, two separate transactions were made. In transaction one, Defendant agreed to convey property to Plaintiff for a certain amount of money. This transaction was memorialized by the Land Purchase Agreement. As a sub-duty in that transaction, Defendant also agreed to provide sewer and water lines. In transaction two, Defendant agreed to lend its own money to Plaintiff so that Plaintiff could pay for the lot. In transaction one, there is a buyer-seller relationship and the duties at issue are the duties of buyers and sellers. In transaction two, there is a lender-debtor relationship. Just because Defendant was the seller in transaction one and the lender in transaction two does not mean the particular duties and the separate transactions can be intertwined. On the issue of whether Plaintiffs have a right to retain ownership of their lots in spite of not paying their lender, Defendant's failure to provide a sewer line has no relevance. What is relevant are the terms of the Mortgage and Promissory Note and those terms indicate Plaintiffs are in serious breach while Defendant is not. (Promissory Note at 1, Exhibit B to Memorandum in Support of Motion to Dissolve on September 11, 2003). Thus, although good case law for other issues, Arthur D. Little, Inc. v. Dooyang Corporation, 147 F.3d 47 (1998) and Marriott, et al. v. Harris, 368 S.E.2d 225 (1988) do not apply here. Plaintiffs breached their duty to pay.

Second, Plaintiffs' arguments go against all notions of law. Basically, Plaintiffs are claiming that a buyer can purchase property for no consideration at all if the seller fails to provide a sewer line. That is far from the truth. Remedies must always be no greater than the damages suffered by a victim. 20 G.C.A. § 2280. ("Notwithstanding the provisions of this Chapter, no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides . . . ."). Defendant conveyed good title in land to Plaintiffs and there is a price for that title, even if the land is missing a sewer line. The failure to provide promised sewer lines is a definite breach but it does not give Plaintiffs the right

14

to own land for free.

For these two reasons, there is no legal basis for stopping foreclosure and therefore, there is no likelihood of success as required in a TRO under Rule 65(b).

**D. A TRO Here Would Be Counter-Intuitive**

There are other reasons the Court is reluctant to issue any type of TRO.

First, stopping a foreclosure would be an unfair expansion of the remedies already provided under 21 G.C.A. § 60314(f). When Plaintiffs filed their suit in September, 2002 under 21 G.C.A. § 60314, they had two choices: one, a rescission of the Land Purchase Agreement under 21 G.C.A. § 60314(f)(1) or two, a money recovery under 21 G.C.A. § 60314(f)(2). They chose a money recovery under 21 G.C.A. § 60314(f)(2) and were eventually granted an award of $580,000.00 for their injuries in accordance with 21 G.C.A. § 60314(f)(2). With this current request for a TRO, Plaintiffs seem to want the favorable half of the 21 G.C.A. § 60314(f)(1) rescission remedy plus all of the 21 G.C.A. § 60314(f)(2) remedy. They want to rescind their payment duties as would be enjoyed under a 21 G.C.A. § 60314(f)(1) claim but still enjoy the reparations award in their 21 G.C.A. § 60314(f)(2) claim. This is clearly not allowed in 21 G.C.A. § 60314; 21 G.C.A. § 60314(f) provides an either-or remedy.

Second, stopping foreclosure would go against all notions of equity and it would paralyze progress towards the ultimate goal in this matter. There is just no feasible way for a for-profit real estate company such as Defendant to pay a large amount of money for a sewer line when its entire means of income (payments on land sales) has been shut down. By Plaintiffs' refusal to pay, the parties are in a stale mate. With a TRO, any resolution in this matter would become impossible and the real victims would be the people of Guam.

**II. Foreclosures**

The Court notes that on June 12, 2006, Defendant filed an Amended Answer and Counterclaim. In that pleading, Defendant countered Plaintiffs' complaint with its own claims -

15

the foreclosure claims. Such a counterclaim gives this Court subject-matter jurisdiction over the issue of foreclosures. Although the reasoning presented in this Findings of Fact and Conclusions of Law was intended for just the TRO dispute, the Court advises that everything written herein is a definite indication of the Court's inclinations toward any foreclosure matters that may arise.

**III. Sanctions**

Superior Court of Guam Rule 9 states, "[A]ll applications for ex parte orders shall be heard in open court . . . . Such applications shall be accompanied by a declaration containing the following: . . . B. That a good faith effort has been made to advise counsel for all parties . . . of the date, time, place and substance of the ex parte application . . . ."

This Court believes that Superior Court of Guam Rule 9 requires not only a declaration of a good faith effort but also an actual good faith effort. That means Plaintiffs' counsel was required by Superior Court of Guam Rules to put forth a good faith effort in advising attorney Van de Veld of the date and time of the TRO hearing. From the content of attorney Van de Veld's Declaration, it appears they did not.

Nevertheless, sanctions are a tool to which this particular Court is not accustomed. The Court believes a simple admonition will accomplish the same thing any sanctions would. Therefore, the Court admonishes Plaintiffs' counsel and rejects the request for sanctions.

## CONCLUSION

Based upon a preponderance of the evidence and for the reasons cited above, the Court denies Plaintiffs' Motion for a TRO and denies Defendant's request for sanctions.

SO ORDERED this ___5___ day of _____O C T___, 2006.

HONORABLE ANITA A. SUKOLA
JUDGE, SUPERIOR COURT OF GUAM

16

